**Opinion issued October 22, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00189-CV
_____

**BETH BRYANT, ATASCOCITA UNITED METHODIST CHURCH AND THE WEEKDAY LEARNING CENTER, Appellants**

**V.**

**S.A.S. AND L.O.S., INDIVIDUALLY AND AS NEXT FRIENDS OF E.R.S. AND E.L.S., THEIR MINOR CHILDREN, Appellees**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-41141**

---

## O P I N I O N

The Smiths hired sixteen-year-old Morgan Bryant to babysit their children.[1]

Morgan's babysitting services were advertised in a paper flyer placed in the

---

[1]     "Smith" is a pseudonym.

backpacks of the Smiths' children. After hiring Morgan several times to babysit, the Smiths learned that Morgan had sexually assaulted their children. The Smiths reported the crime to the authorities, who pursued criminal charges against Morgan. Morgan pleaded guilty to felony sexual assault of a child, and the criminal court assessed twelve years' incarceration as punishment.

On behalf of themselves and their children, the Smiths sued Morgan, the Atascocita United Methodist Church, which operated the Weekday Learning Center, the childcare center itself (collectively, the Church), and Beth Bryant, Morgan's mother, who also was a teacher at the childcare center. The jury returned a verdict in favor of the Smiths. The Smiths' civil cause of action for assault and battery against Morgan provides the basis for most of the jury's damages award. Morgan appeared at trial solely through his deposition, and he does not appeal the judgment against him. The Smiths, however, also recovered damages against Beth Bryant and the Church, on the basis that these defendants violated the Texas Deceptive Trade Practices Act (DTPA), by: (1) misrepresenting Morgan's child care experience; and (2) failing to disclose his psychological condition at the time the Smiths received the flyer advertising his babysitting services. This appeal arises from the civil judgment entered on those DTPA findings in favor of the Smiths and against the Church and Beth Bryant.

Beth Bryant and the Church contend that the trial court erred in entering a judgment against them, because (1) no evidence supports the jury's findings that Bryant and the Church's DTPA violations caused the Smiths' damages; and (2) in any event, the DTPA does not afford any recovery for economic or mental anguish damages that flow from purely personal injury claims. In a cross-appeal, the Smiths contend that the trial court erred in apportioning its attorney's fee award. Following the Texas Supreme Court's analysis in *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472 (Tex. 1995), we hold that no evidence supports the jury's DTPA causation finding against the Church and Beth Bryant; therefore, we reverse the judgment. In light of our disposition, we need not reach the other issues presented in this appeal.

**Background**

## I.    *Facts giving rise to the suit.*

In the summer of 2007, the Smiths enrolled their two young sons in the childcare center. Beth Bryant's daughter, Kelsey, a twenty-year-old college student, worked at the center as a teacher and swimming instructor in a summer job between her junior and senior years of college.

Beth Bryant herself spent the first part of the summer of 2007 teaching Vacation Bible School at the Church. She had five years' prior experience working at the childcare center and wished to return to work there. She applied and, in August, the center rehired her to work as a teacher. Bryant's class contained the younger Smith boy. Mrs. Smith developed a warm rapport with Bryant and appreciated Bryant's caring interaction with her son.

After Kelsey returned to college in the fall, she asked her mother to circulate a flyer to school parents to let them know that she would be available for babysitting during her winter break. The school often circulated flyers that advertised events and personal services by placing them in the children's backpacks. Under the school's policy, it pre-screened each proposed flyer. If the school approved the flyer, it charged $20 to circulate it.

In late fall, Beth Bryant circulated an approved flyer offering Kelsey's babysitting services. The flyer explained that Kelsey was Bryant's daughter, that she had been a "Summer School Fish" teacher at the center, that she was CPR-certified, and that she would provide references upon request. The Smiths hired Kelsey to babysit for their sons during the winter break.

Near the end of 2007, Bryant prepared a similar flyer, this time advertising Morgan's availability for babysitting services. The flyer read:

HELP AROUND THE HOUSE?

(Documented Day Labor)

POSSIBLE BABYSITTER AT YOUR SERVICE

Need someone while WLC is on break for the Holidays?

**MORGAN BRYANT**

HHS Junior – Eagle Scout – IB Student (College Prep)

16 years old – driver's license – can provide own transportation

(Beth Bryant's son – T/Th Bee's Teacher)

Part-Time WLC Summer School Help

WLC Vacation Bible School Worker

Need someone to help with the kids while you work around the house?

Someone to watch the kids while you shop?

Great companion for your 'boys'!

Call and arrange for a meeting and see if I can help you out during the holidays!

The childcare center approved Bryant's flyer and gave permission to her to circulate it. The flyer went home in the children's backpacks, along with other materials that the school distributed.

The Smiths' experience with Kelsey's babysitting services was a good one; they were disappointed to learn that she would not be available after she returned to college at the beginning of January. During Mrs. Smith's conversation with Bryant about Kelsey's imminent return to college, Bryant mentioned to Mrs. Smith that "Morgan babysits," and gave her another copy of Morgan's flyer. Though the

flyer states that Morgan was part-time summer help and a vacation bible school worker, at the time Beth Bryant gave the Smiths the flyer, the childcare center had not yet employed Morgan. It also had not performed a criminal background check on him, and it had not trained him to work with children. The childcare center had, however, offered the possibility that Morgan could work part time the following summer as summer school help.

The Smiths together discussed the possibility of hiring Morgan. Despite some doubts, they decided to do so, because, according to the flyer, he had experience working with children and, in particular, experience working at the childcare center. They did not ask Morgan directly whether he had such experience.

The Smiths hired Morgan in the first week of January 2008. Morgan went to the Smiths' home while the Smiths were present, and Mrs. Smith "ended up paying Morgan to come to the house to spend time with us, interact with the boys, [and] get to know them, because my overriding concern was just the transition of them getting to know someone new." Mrs. Smith's first impression of Morgan was not positive, but she thought, "okay, maybe he's just not good with grown-ups," and that "he must be good with kids or the center wouldn't have hired him."

Morgan first babysat alone with the boys at the Smith's home a couple of weeks later. He babysat for the Smiths approximately five to ten times between

6

January and June 2008. Toward the end of that period, Mrs. Smith noticed a change in Morgan's attitude. It caused her concern, and she decided to stop hiring him.

Meanwhile, following up on the center's offer to employ Morgan that summer, Morgan completed his application for summer employment at the center in February 2008 and cleared a criminal background check. Morgan worked at the center as a paid employee for one day, in late June. About then, the Smith boys disclosed to their parents that Morgan had molested them while he was babysitting. The Smiths contacted law enforcement, and Morgan was arrested. The childcare center immediately discontinued Morgan's employment.

Morgan later admitted to having sexually assaulted the boys; he pleaded guilty to felony charges. In his civil deposition for this case, Morgan testified that the incidents of abuse occurred in March, April, and May of 2008. The criminal court sentenced him to twelve years' imprisonment. Before his arrest, Morgan had no criminal history and no record of any school misconduct that would warrant suspension.

## A. *Morgan's experience with children.*

Morgan had volunteer experience helping his mother at vacation bible school and had helped his sister Kelsey in her classroom during the summer of 2007. However, he had no experience babysitting or caring for children by himself.

The Church maintains a safe sanctuary training program in an effort to protect children from, among other things, sexual predators. The written Church policy requires that "[a]ll persons working with children and youth receive training on Safe Sanctuary issues and . . . undergo a criminal background screening prior to serving." Because Morgan had not been employed by the childcare center at the time the flyer was distributed, the childcare center had not completed a criminal background check, nor had Morgan received safe sanctuary training. When the Church completed the check in February, Morgan had no criminal history.

## B. *Morgan's psychological history.*

Morgan was diagnosed with attention deficit disorder in the eighth grade, for which he was prescribed medication. Between his freshman and junior years of high school, Morgan's parents discovered that he had viewed adult pornography on the internet a few times, and they confronted him about it. After the first time, the Bryants installed an internet filter. Morgan stopped viewing the pornographic sites for a few months, but he later managed to work around the internet filter. The

second and third times, they again lectured Morgan about the evils of pornography. The Smiths' expert psychologist testified that the vast majority of sixteen-year-old boys have visited pornographic websites. She further opined, however, that an adolescent boy whose parents caught him viewing pornography two or three times in a three-year period would raise "a red flag."

In December 2007, Morgan was diagnosed with depression, for which his physician, in consultation with a psychologist, prescribed an antidepressant. Morgan began to receive regular psychological counseling. His depression came to his mother's attention when she learned that Morgan, uncharacteristically, had skipped school because he was unprepared for class and was extremely stressed about his academic performance. The medication and counseling appeared to alleviate his condition. At that time, Morgan's psychologist subjected Morgan to clinical testing. Nothing in the results led the psychologist to suspect that Morgan presented a danger to young children. During their many sessions, Morgan never mentioned anything to his psychologist that would have led him to suspect that Morgan had tendencies toward pedophilia or sexual deviancy. In the course of the legal proceedings against him, however, Morgan admitted that he had begun to have private thoughts about molesting young boys. He told no one about them—not his doctors, his counselors, or anyone in his family.

9

## II. *Procedural history.*

Through their DTPA claim, Smiths sought their past and future counseling and therapy expenses, the cost of repairing their home furnishings damaged by evidence collection in the criminal investigation, lost earnings, and pain and mental anguish.

The jury found that:

- Beth Bryant and the childcare center violated the DTPA by either "(a) Representing that Morgan had sponsorship, approval, status, affiliation, or connection that he did not have, or (b) Representing that services are or will be of a particular standard, quality, or grade if they were of another," they did so knowingly, and Bryant did so intentionally.

- In preparing the flyer, Beth Bryant knowingly and intentionally failed to disclose information and engaged in an unconscionable course of conduct "with the intention to induce [the Smiths] into a transaction they otherwise would not have entered into if the information had been disclosed."

- Bryant was acting in the scope of her employment in circulating the flyer.

The jury apportioned responsibility as follows: five percent to the Church, five percent to Bryant, and ninety percent to Morgan. The trial court entered judgment on the jury's findings. It awarded the Smiths their attorney's fees and apportioned them among the defendants according to the responsibility findings. The trial court denied Bryant and the Church's motion for judgment notwithstanding the verdict, raising the issues now presented on appeal.

10

## Discussion

We first examine whether any evidence supports a finding that the misrepresentations in the flyer caused the damages the trial court assessed against the Church and Beth Bryant under the DTPA.

### A. *Standard of review*

Bryant and the Church challenge the trial court's denial of their motion for judgment notwithstanding the verdict, contending that no evidence supports the jury's finding that the representations in the babysitting flyer were a producing cause of the Smiths' damages. The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Rulings on motions for jnov, if made on an evidentiary basis, are reviewed under the same legal-sufficiency test we apply to other no-evidence challenges. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (citing *City of Keller*, 168 S.W.3d at 823. We review the evidence in a light favorable to the jury's finding. *Sw. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274 (Tex. 2002).

11

### B.    DTPA

To prevail on a DTPA claim, the Smiths must prove that: (1) they were consumers; (2) the Church and Bryant engaged in at least one of the laundry list items; (3) the Smiths detrimentally relied on the false, misleading, or deceptive act or practice; and (4) the false, misleading, or deceptive act or practice was a producing cause of the Smiths' injury.  *See* TEX. BUS. & COM. CODE § 17.50(a) (West 2011); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex.1996); *B&W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 21 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  If a DTPA claim is based in part upon a failure to disclose material information, the statute also requires proof that the defendant knew the information and failed to bring it to the plaintiff's attention.  *See* TEX. BUS. & COM. CODE ANN. § 17.46(b)(23) (West 2011) (stating that it is unlawful to fail to "disclose information concerning . . . services which was known at the time of the transaction").  A defendant has no duty to disclose material facts it should have known but did not.  *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995); *Robinson v. Preston Chrysler-Plymouth, Inc.*, 633 S.W.2d 500, 502 (Tex. 1982).

12

## C.     Causation

The jury found that the Smiths would not have hired Morgan but for the representations in the flyer, and that those representations were a substantial factor in bringing about their damages.  Bryant and the Church contend that the Texas Supreme Court's decision in *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995), compels the conclusion that such evidence is legally insufficient to prove causation.

In *Boys Clubs*, the plaintiffs sued the organization both in negligence and under the DTPA, seeking damages arising from the sexual molestation of boys by Mullens, who was a Boys Clubs volunteer.[2]  *Id.* at 475.  The Smiths contend that *Boys Clubs* is inapposite, because it analyzes causation in the context of the plaintiffs' negligence claim, not their DTPA claim.  The Smiths correctly point out that, unlike the more lenient producing-cause element required under the DTPA, the proximate cause element of a negligence claim requires greater foreseeability.  Nevertheless, both producing cause and proximate cause share the primary requirement that the plaintiff prove the defendant's conduct was the cause in fact of the alleged injury.  *See Boys Clubs*, 907 S.W.2d at 481 ("Raising a fact question of producing cause, as with proximate cause, requires some evidence that the defendant's act or omission was the cause in fact of the plaintiff's injury.");

---

[2]     The facts giving rise to the suit predated the 1995 amendments to the DTPA limiting recovery to economic damages.

13

*Prudential Ins. Co.*, 896 S.W.2d at 161 ("The element common to both proximate cause and producing cause is actual causation in fact.") (both citing *Gen. Motors Corp. v. Saenz,* 873 S.W.2d 353, 357 (Tex. 1993)).   It thus is appropriate to examine *Boys Clubs* for guidance in reviewing this case.

In *Boys Clubs,* the court recites that Mullens began to volunteer at the club in the spring of 1986 to fulfill a sixty-hour community service requirement imposed in connection with his second conviction for driving while intoxicated. 907 S.W.2d at 475.  That summer, the Coes brought their grandsons to the Club, after seeing an advertisement that promoted the Club as having "a wholesome environment." *Id.* at 479–80.  They met Mullens while he was working as a volunteer on the Club's premises. *Id.* at 476.  Mullens began to visit the Coe home almost every weekend in the latter part of the summer of 1986 and then began to visit even more, including weekday visits. *Id.* at 476, 481.  Mullens continued to volunteer at the Club after completing his community service hours.

The Coes permitted Mullens to take the boys on outings within weeks of meeting him. *Id.* at 481.  At the end of the summer, Mullens offered to take the boys on an overnight camping trip. *Id.*  Before accepting the offer, Mrs. Coe contacted the Club to make further inquiry about Mullens.  The Club staff told her that Mullens was a volunteer, that he worked for the sheriff's department, and that

14

he "seemed to be okay," but that Mrs. Coe would need to "decide for herself" whether to let him take the boys camping. *Id.* at 476, 480.

During the camping trip, Mullens sexually abused one of the Coes's grandsons. Later that fall, he took the boys on a fishing trip, during which he abused another. By the following summer, Mullens had become a regular guest in the Coes's home, sometimes spending the night. Mullens repeatedly abused the boys during this period. Sometime in 1988, the Coes learned that Mullens had been sexually assaulting their grandsons. They sued the Boys Clubs, bringing claims under various negligence theories and the DTPA. *Id.* at 476.

With respect to the Club's representation that it "[c]hecked out" its volunteers "thoroughly," the Texas Supreme Court agreed that the statement this was false, but concluded that the requisite causal connection was broken. *Id.* at 481. Similarly, in considering causation in this case, we assume, without deciding, that the evidence supports the jury's DTPA findings that Bryant and the Church made actionable misrepresentations. Cause in fact requires proof those misrepresentations were a substantial factor in bringing about the injuries, and without them, the harm would not have occurred. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2003). The Supreme Court has explained that

15

[t]he word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred.

*Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 & n.1 (Tex. 1991) (quoting

RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)), *quoted in Transcont'l Ins.*

*Co. v. Crump*, 330 S.W.3d 211, 224 (Tex. 2010). Evidence that the defendant's

conduct did no more than furnish a condition which made the injuries possible

does not satisfy the cause-in-fact requirement. *Boys Clubs*, 907 S.W.2d at 478.

Even if the injury would not have happened but for the defendant's conduct, the

connection between the defendant and the plaintiff's injuries simply may be too

attenuated to constitute legal cause. *Id.* at 477–78.

In *Doe*, the Texas Supreme Court agreed with the trial court that the Coes

had failed to raise a fact issue that the Boys Clubs's representations were a

producing cause of the Coes's injuries. *Id.* at 480–81. Although the Coes met

Mullens at the Boys Clubs's premises, the Court explained, they developed a

relationship independent of the Boys Clubs, through which Mullens manipulated

the Coes into giving him unsupervised access to their grandchildren. *Id.* The

Court further noted that the criminal conduct did not take place at the club. *Id.*

Any of the misrepresentations, including that the club performed thorough

16

background checks of its volunteers, the Court concluded, did no more than furnish a condition that made the injuries possible. *Id.*

We follow the reasoning in *Doe* to determine that a legal cause sufficient to impose civil liability for the criminal conduct of another is similarly lacking in this case. The flyer and Bryant's comment led the Smiths to offer a job to Morgan to babysit their children. The first time they hired Morgan, Mrs. Smith remained present to observe Morgan's interaction with her sons. The molestation began two months later. By then, the Smiths had hired Morgan at least two other times after their first observation visit. Without any prompting from, or remuneration to, Bryant or the Church, the Smiths hired Morgan to babysit the boys five to ten times during the period from January to May 2008.

The Smiths suggest that we distinguish *Boys Clubs* based on the duration of the families' independent relationships with the perpetrators of the abuse—two years in the *Doe* case and five months in this one. But *Boys Clubs* is not so different from this case in timing as to undermine its fundamental holding that representations of character or fitness cannot impose third-party liability for the criminal conduct of another, when the criminal conduct happens independently. In *Doe*, the Coes met Mullens at the club at the beginning of the summer; their grandsons' first camping trip with Mullens—and also the first incident of sexual abuse—occurred at the end of that summer. In comparison, the Smiths received

17

the flyer and first hired Morgan in early January 2008. The first incident of abuse occurred in March, during the third or fourth time that Morgan babysat for the Smiths. Although the length of time can be a factor in determining whether a causal chain is broken, the duration in the two cases does not, standing alone, distinguish *Boys Clubs* in a way that would lead to a different result. As the Texas Supreme Court explained there: "[c]ommon sense tells us that the relationship between Mr. and Mrs. Coe and Mullens developed independently of the Boys Clubs's relationship with the Coes," even though Mullens met the Coes through his work at the Club. *Id.* at 481.

Likewise, the relationship between Morgan and the Smiths developed independently of Bryant and the Church. After the initial flyer, all of the contact between Morgan and the Smiths took place at the Smiths' home. As with the Coes and Mullens in the *Doe* case, the Smiths' own interactions with Morgan informed their decision to continue to hire Morgan. By the time of the abuse, the connection between the representations in the flyer and Morgan's presence in the Smith's home was too attenuated to cause the Smiths' injuries—as in *Doe*, the misrepresentations in the flyer created a condition that later made the grievous injuries possible—it was not a producing cause of them. *See id.*

## Conclusion

We hold that the record does not contain legally sufficient evidence that the Church and Bryant's representations caused the Smiths' damages. Thus, the trial court erred in denying Beth Bryant and the Church's motions for judgment notwithstanding the verdict. We reverse the judgment of the trial court and render judgment that the Smiths take nothing against Beth Bryant, Atascocita United Methodist Church and the Weekday Learning Center.



Jane Bland
Justice

Panel consists of Justices Jennings, Bland, and Massengale. Justice Jennings dissents in a separate opinion.